## Case No. 14,098.

TOOLEY v. RAILWAY PASS. ASSUR. CO.

[3 Biss. 399; 2 Ins. Law J. 275; 4 Chi. Leg. News, 311; 4 Bigelow Ins. Cas. 34.] [1]

Circuit Court, S. D. Illinois. Jan. 29, 1873.

INSURANCE—ACCIDENT—GETTING ON OR OFF TRAIN—RULES OF RAILROAD—DESTINATION—NEGLIGENCE.

1. Under a clause in an accident insurance policy limiting the liability to an accident received by the defendant "while actually traveling in a public conveyance provided by common carriers, and in compliance with all rules and regulations of such carriers," a recovery can be had for an accident happening while getting on or off the train.

2. Nor is the insured bound to examine the time card or ascertain all the minutiæ connected with the management of trains, but only such rules as a general traveler might be presumed, and ought to know.

3. If he attempts to get on a train after it has reached his destination, he does so at his own risk.

4. General rules of negligence stated.

This was an action by Daniel H. Tooley, administrator of the estate of John Tooley, deceased, against the Railway Passenger Assurance Company of Hartford, Connecticut, on two accident policies of insurance for $3,000 each, issued by the defendant to the deceased.

Robinson, Patton & Lee and Mr. Peacock, for plaintiff.

B. S. Edwards and W. H. Brown, for defendant.

Before DRUMMOND, Circuit Judge, and TREAT, District Judge.

DRUMMOND, Circuit Judge (charging jury). John Tooley, on the 24th day of January, 1871, took from the agent of the defendant, at Quincy, Illinois, two policies of insurance, for $3,000 each. That amount was to be paid on each policy in case of the death of Tooley within two days. It was provided that the liability should not exist unless while he was actually traveling in a public conveyance of common carriers, and in compliance with their rules and regulations, and besides he was not to neglect the use of due diligence for self-protection.

Tooley, on the afternoon of the 25th of January, took the Champaign accommodation train at Chicago and proceeded to Kankakee, where the train arrived shortly after seven o'clock.

It seems the practice was for the train to stop at the station and then pass on to the coal-bin, provided they took the entire train beyond Kankakee.

Accordingly, on this evening the train stopped at the station, and several persons left the cars, Tooley among others. The train remained at the station several minutes and took in water. The bell was then rung, the conductor signaled with his light, and the train went on to take in coal. There was a platform extending from the station house alongside of the railroad track towards the water-tank and coal-bin. When the train moved on, Tooley, who was standing by a door of the station house, started forward on the platform to overtake the train. When he reached the train, he extended his hands to grasp the car rails, and fell between the two passenger cars, and was run over and instantly killed.

The first question is, what was the measure of responsibility of the defendant under these policies of insurance? The language of the policies is: "Provided always that this insurance shall only extend to bodily injuries, fatal or nonfatal, as aforesaid, when accidentally received by the insured while actually traveling in a public conveyance provided by common carriers for the transporting of passengers in the United States, or the dominion of Canada, and in compliance with all rules and regulations of such carriers; and not neglecting to use due diligence for self-protection."

These are the only conditions material to be considered in the examination of this case. Tooley must have actually been a traveler in or upon the train; but it cannot be said that the responsibility ceased whenever he stepped out of the car to alight at a station, and that it never became operative again until his foot entered the car to resume his journey. That would be giving too narrow a meaning to the clause of the policy. We think that the fair construction of the liability assumed by the defendant in this respect was, that it included injuries received by Tooley while necessarily getting on or off the train, as a traveler upon it.

Secondly—It is a question of fact to be determined by the jury—was Tooley, at the time the injury was received by him, a traveler on the train? And this will depend upon the fact whether his journey terminated at Kankakee. It is claimed on the part of the defense that that was the termination of his journey, and, if so, then he was not a traveler on this train at the time of the accident.

I will call your attention to some of the facts having a bearing on this question. The conductor states in his evidence that when he took up the tickets of the passengers, Tooley's ticket was only for Kankakee. That is a fact proper to be considered by the jury in order to determine whether or not his journey extended beyond Kankakee—not conclusive, of course—because, as a matter of experience, we know that where men commence a journey, they do not always buy their ticket to the termination of the journey; and various circumstances may happen during the progress of a journey, to change the purpose of the traveler.

Mr. Merwin states in his evidence that in a conversation he had with Tooley he said

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 4 Chi. Leg. News, 311, contains only a partial report.]

that he intended or expected to go to Mattoon, which was south of Champaign, where the train stopped. [The way that arose was this: It was in relation to the seats; he wanted two seats, as he said, so that he could sleep, as he "thought or expected to go to Mattoon."] [2] Now, as qualifying this, perhaps, and to some extent inconsistent with it, is the testimony of the conductor. He says that just before they arrived at Kankakee he woke up Tooley and told him that the next station was Kankakee, and that Tooley made no remark intimating in any way that he intended to go further than Kankakee, and, therefore, that it was not necessary for him to be disturbed. It is for you to say how much bearing this may have upon the question [whether his journey terminated at Kankakee, and how far it may affect the statement of Merwin.] [2]

There is this other fact, that when the train started at Kankakee, Tooley attempted to get on it. That is claimed to be conclusive evidence of his purpose to proceed further. [It is for you to say what bearing that may have upon this particular question that we are now considering. Then, again, in relation to whether or not he had any baggage with him. It is said that there was a satchel or valise there, and that it was not found after his death. How far this may have any bearing upon the question is a matter to be determined by the jury. The only light in which it is material this question should be considered is, how far it may affect the conduct of Tooley on the general question of negligence.] [2] If his journey ceased at Kankakee, then it cannot be claimed, under the undisputed facts of this case, that the defendant would be liable, because, on the assumption that he was going no further than Kankakee, in attempting to get on the train as he did, it was at his own risk. If he were going beyond Kankakee on the train, then there are other considerations which may affect the question of negligence. According to the view which we take of the contract between the parties, if he were a passenger proceeding beyond Kankakee, on the train, he had the right to leave the car at Kankakee and return to it; he was not bound to remain inside the car all the time.

There is, perhaps, one circumstance which I ought to refer to in connection with the question of the determination of the journey at Kankakee, and it is this, that he did not purchase a ticket at Kankakee, and it is in evidence that the train stopped there several minutes; and if you believe the testimony on this point, he certainly had ample time to purchase one. Still that of course is not conclusive. He had the right, I suppose, under the practice and management of the train, to pay his fare on the cars. One of the conditions of these policies is, as has

been stated, that Tooley should comply with all the rules and regulations of common carriers. We are not prepared to say that it was incumbent on him, under the circumstances of the case, to make himself acquainted with all the rules which might be contained upon the time card. We must give this clause of the policy a reasonable construction.

A policy is issued, we suppose, to any applicant. It is what is called an accident policy, and we are to infer that the meaning of this clause was that the traveler should only make himself acquainted with those general rules, as to the management of trains, and the conduct of railroads which are presumed to be known to travelers under these circumstances. For instance, Tooley, as far as we know, was a stranger on this road. We cannot say that when he went on the train he was obliged because of this clause in the policy to examine the time card and ascertain all the minutæ connected with the management and running of trains, but only such rules as a general traveler might be presumed, and ought to know. Any other construction than this would operate as a snare upon travelers. [To hold that the traveler must become acquainted with every minute rule which may be prescribed on the back of a time card, we think cannot be said to be the true meaning of this clause of the policy.] [2] But, perhaps, if he did not know the time the train stopped at a particular place there might be a question whether it was not his duty to make some inquiries of the employés on the train. It is to be observed in deciding this question of negligence of Tooley, which is the last question to be considered, and to which I call the attention of the jury, that this is not an action between the representative of Tooley and the railroad, but between the representative of Tooley and the underwriter upon this clause in the policy, "not neglecting to use due diligence for self-protection." And perhaps there can be no better rule stated than that which was agreed upon by the counsel, namely, that it was his duty to use that degree of caution and diligence which a prudent man would use under the circumstances in which he was placed. We think, also, in determining this question of diligence on the part of Tooley, it is proper to take into consideration whether or not, when he alighted at Kankakee—which he had a right to do—any notice was given of the movement of the train.

If a person, having a right to leave a train at a station, is informed or notified in any way that the train is going to start, and an opportunity given to him to take his place again upon the train, and he chooses to remain until the train is put in motion and then is injured in getting on the train, it may be said that he is negligent—in other

words, that he takes the risk of getting on the train while thus in motion. But if, having alighted at a station he has no notice by bell, whistle, or otherwise, of the movement of the train, or he has not the opportunity, after notice is given, to get on the train, and intending to go further he attempts to get on the train and is injured, we think there is not the same measure of responsibility upon him. It would be natural for a man—for a prudent man—intending to go further on the train to make an effort, even when the train was in motion, to regain his place on the train.

2 [But while that is so, it is to be understood he must use due diligence in trying to get on the train, and to that question I will now direct your attention for a few moments, on the supposition that he intended to go further, and he had not an opportunity to get on the train, or he was not notified that the train was about to move. It was after seven o'clock in the evening. Tooley proceeded along the platform. There has some question been made whether the bell was rung. We think it perhaps ought to be assumed in this case that that fact has been established. It is proved that was the practice of the engineer just before the train started; that it was a signal to the conductor that the engineer was ready to proceed. It is also distinctly sworn to by the conductor that the bell was rung, and it is a fact stated by one or two of the witnesses that the remark was made, "The bell is ringing," which, under the circumstances, of course is a very material fact. This is not otherwise contradicted than by the statements of several witnesses that they did not hear, or do not recollect that they heard, the bell. However, we leave this question to be determined by the jury. Of course negative testimony is not so material or important as positive testimony, if you believe that these witnesses stated the truth. There is some controversy as to the character of the night. Several of the witnesses say that it was a clear night; some that it was moonlight, and some state that it had been snowing or storming. There is no doubt of this fact, or I think we may assume it, that the intent of Tooley was when he heard the bell, or an intimation was given in that way, or by the movement of the cars, to get on the train. He proceeded rapidly along the platform. He tried to get on the train. Now did he act prudently, as a prudent man, in getting on the train? Mr. Lawrence says, when he came around the corner of the station house, and he saw a man running, or walking fast, that he called out to him that the train was only going to coal up, or something to that effect. Now it is true that Mr. Tooley was not bound to take any declaration made by an outsider or an indifferent person as true, in relation to the management of the train or its motions.

The only effect of that is this, that it changes the measure of his responsibility, and gives color to his conduct,—to his action; and you are to treat it in a different manner from what you would provided he had no intimation whatever given to him, because if a man, after being notified of a particular fact, which should govern or rule his conduct, chooses to act in such a way as to encounter risk or danger, you will see that the rule of diligence is different. It is material for the jury to consider this in that light alone, and then it will be a question, as far as it bears upon the conduct of Tooley, whether or not he heard what was said by Mr. Lawrence, and of course it is simply a matter of inference whether or not he did hear; positively, we cannot know. This seems to be certain, that the words or the sounds attracted his attention, as he turned round; and it is for you to say whether he heard in such a way as to give him warning that the train was not to go farther than the coal-bins, whether or not he heard the language, or whether he heard a sound merely, without distinguishing or understanding what was said. All these are to some extent matters of conjecture, and it is for the jury to determine how far they may affect this question. He passed by the rear platform of the rear car. We think that is a fact to be taken into consideration by the jury in determining whether he did or did not act as a prudent man, if he believed that the train was going on, and wanted to get on the train to resume his journey. Of course you will understand that the danger was much less in getting on the rear platform than on the forward platform of the car. The fact is that he did not attempt to get on the rear platform of the car. The train was moving slowly. It does not appear that he was actually running, although walking very fast. He attempted to get on to the cars, either on to the forward platform of the rear car, or between the two cars. If, in point of fact, when he slipped and fell, he was attempting to get on between the cars, it is difficult to reconcile it with our ideas of prudence on the part of any man under such circumstances. That may be an important fact for you to inquire into, whether that is so or not, as I believe is stated by one of the witnesses. It is very much a question for the jury, under these rules which the court has laid down, whether this man, under the circumstances, conceding that he was going further, acted prudently; whether or not he was guilty of negligence. It is, perhaps, natural that the sympathies of a jury should be enlisted in favor of the man, or his representatives or family; but this case, like every other, has to be decided under the law and facts, and you are to apply your best judgment and intelligence to the facts, taking the law from the court, and drawing your conclusions upon those facts, without being influenced or biased by the relative positions

---

2 [From 2 Ins. Law J. 275.]

of the parties. This is your imperative duty, and if you do any less than this you do not come up to the measure of your responsibility. It is not a question of sympathy or feeling, but of law and evidence.

[I will dismiss this case with one further remark. There has not been any light thrown upon the motives of the journey of Tooley from Chicago to Kankakee. We were left in ignorance of that when we tried this case before, and we are now just as ignorant. It may be that there is an impenetrable mystery hanging over this journey. It is said that he was going to Nokomis, in Montgomery county, which was his residence. In point of fact, when he was required to give his residence as a memorandum on the policy demanded, he gave it as Topeka, Kansas, not Nokomis, Montgomery county, Illinois. Of course this is no further material than as it may have a bearing upon the journey of Tooley. It is in one sense no matter of ours, or of these defendants, where he was going. That was not the question. He was insured for the two days, wherever he might go. There is nothing stated in these policies as to the proof of loss or damage, as the case might be, or as to the time within which the payment would be made if there were damage. It has been admitted that notice was given, so as to that there is no controversy. The policy required that notice should be given. Then we understand that the true construction of it would be that if notice were given, it was the duty of the company to pay within a reasonable time, and interest would run from the expiration of that time when the payment ought to be made. I do not know that it is necessary to trouble the jury with that. Probably counsel will agree about that matter.

[Mr. Morrison. Yes, your honor; we have agreed on that.

[THE COURT. Very well, then, you may simply say, by your verdict, whether you find for the plaintiff or the defendant.

[Verdict for plaintiff for $6,633.] [2]

NOTE. This case was appealed to the supreme court, and is now pending there. [Case dismissed in supreme court April 21, 1874, on appellant's motion. No opinion. Case unreported.] The company may be held liable for injuries sustained in alighting. Keller v. New York Cent. R. Co., 24 How. Prac. 172; Pennsylvania R. Co. v. Kilgore, 32 Pa. St. 292; Pennsylvania R. Co. v. Zebe, 33 Pa. St. 318, 37 Pa. St. 420; Fuller v. Naugatuck R. Co., 21 Conn. 559. Also for injuries in leaping from the train to avoid being carried by. Davis v. Chicago & N. W. R. Co., 18 Wis. 175; Pennsylvania R. Co. v. Aspell, 23 Pa. St. 147. An accident happening to the assured while stepping from the carriage at his place of destination, is within the policy. Theobald v. Railway Pass. Assur. Co., 10 Exch. 44. The company may be liable, though the assured fell between the cars when attempting to get on them while in motion. Schneider v. Provident Life Ins. Co., 24 Wis. 28. The New York court of appeals have recently decided that an accident policy insuring against personal injury "when caused by any accident while traveling by public or private conveyances provided for the transportation of passengers," covers an accident happening from falling upon a slippery sidewalk, while walking from the steamboat landing to the railway station, that being the usual route, and she so walking in the actual prosecution of her journey; and the fact that there were hacks at the landing by which she might have ridden, does not affect the question. Northrup v. Railway Pass. Assur. Co., 43 N. Y. 516, reversing same case in the supreme court, reported in 2 Lans. 166.